**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**
_____

THOMAS DYER,                                    Case No.:
an Individual, and

ROGER JOHNSON
an Individual
                          Plaintiffs,          HON.

v.
BERRIEN COUNTY,

CHARLES HEIT
In his individual and official capacities, and

L. PAUL BAILEY
In his individual and official capacities

                          Defendants.
_____

Bradley K. Glazier (P35523)
Robert M. Howard (P80740)
CUNNINGHAM DALMAN, P.C.
Attorneys for Plaintiff
321 Settlers Rd.
Holland, MI 49422
(616) 392-1821

_____

## COMPLAINT AND JURY DEMAND

Plaintiffs Thomas Dyer and Roger Johnson, by their attorneys, Cunningham Dalman P.C., state the following as their complaint against defendants, Berrien County, L. Paul Bailey, and Charles Heit:

## JURISDICTIONAL ALLEGATIONS

1.    This is an action brought for defendant's violations of Title VII of the Civil Rights Act of 1964, as amended, 42 USC 2000e, *et seq.* and the Elliott-Larsen Civil Rights Act, MCL 37.2101, *et seq* ("ELCRA").

2. This court has subject matter jurisdiction over plaintiffs Title VII claim pursuant to 28 U.S.C. § 1331, as those claims arise under the laws of the United States. The court has pendent jurisdiction over plaintiffs' state ELCRA claims.

3. Defendant Berrien County is a State of Michigan municipality located within the boundaries of the Southern District of the U.S. District Court for the Western District of Michigan.

4. Plaintiffs Dyer and Johnson are employees of the Berrien County Sheriff's Department ("Sheriff's Department").

5. Dyer and Johnson reside within the boundaries of the Western District of Michigan.

6. Berrien County is the plaintiffs' employer.

7. Defendant Bailey, as the former Sheriff of Berrien County, was a constitutional officer. *Vine v. Cnty. of Ingham*, 884 F.Supp. 1153, 1158 (WD MI 1995). Mich. Const. art. 7, § 4. The "sheriff's department" does not exist as a separate legal entity; it is simply an agent of the county. *Higgins v. Van Buren Cnty.*, No. 19-cv-554 at *7 (WD MI Nov. 1, 2019).

8. Defendant Heit, as the Sheriff of Berrien County, (and former Undersheriff) is a constitutional officer.

9. Defendant Berrien County pays the salaries of deputies of the Berrien County Sheriff, including plaintiffs, at least in part through the County's general funds.

10. Berrien County Sheriff's Deputies are subject to County employment policies and are overseen by the County's Human Resources Department.

11. Defendant Bailey was an agent of Berrien County.

12. Defendant Heit is an agent of Berrien County.

13.     The events giving rise to this cause of action occurred in the Western District of Michigan.

14.     This Court may hear the claims sounding in Title VII pursuant to 2000e-5(f)(3) because it is a "judicial district in the State in which the unlawful employment practice is alleged to have been committed," the "judicial district in which the employment records relevant to such practice are maintained and administered," and the "judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice."

## **GENERAL ALLEGATIONS**

15.     Thomas Dyer began his employment with Berrien County Sheriff's Department ("Sheriff's Department") in February of 2010.

16.     Initially, Dyer was assigned to road patrol as a deputy.

17.     Roger Johnson began his employment with Berrien County Sheriff's Department ("Sheriff's Department") on October 6, 2003. Johnson's initial position was road patrol.

18.     For several years Dyer received positive evaluations of his work and promotions. Dyer was chosen for many special assignments, including working in the narcotics unit, a K9 handler, a defensive tactics instructor and lead instructor, an accident reconstruction unit member, and many other positions in the department.

19.     In 2018, Dyer was named the Berrien County Deputy of the year. He also received many other commendations, including the Michigan Sheriff's Association Medal of honor in 2019, a Homicide Task Force Commendation in 2019, a Lifesaving with Bravery Award in 2018 for saving thirty six occupants from an fully involved structure fire, and the MADD Recognition of Excellence Award in 2012.

20.     The Sheriff's Department has not completed performance reviews in years, but Dyer and Johnson were always ranked in the top tier in all productivity statistics.

21.     For several years Johnson received positive evaluations of his work and promotions. Johnson served in the narcotics unit from 2008 to 2013, then worked in road patrol and in the courthouse, before being promoted to Sergeant in July of 2017. Johnson has received commendations from the U.S. Attorney's office, the Chief Judge of the county for Johnson's response to a courthouse shooting, an award for meritorious service for actions taken off duty that lead to a criminal prosecution, and a life-saving award.

22.     When Dyer worked the K-9 handler position, he received additional pay for caring for the dog, increased overtime opportunities, and a take-home car.

23.     In 2019, Dyer gave up his position as a K-9 handler to get promoted and further his career as a Sergeant. Dyer was told by the Sheriff that he could not be a K-9 handler and a Sergeant at the same time.

24.     Dyer's K-9 Maxx began working with Deputy Grenon.

25.     All of the detectives in the Sheriff's Department were sergeants and lieutenants.

26.     Working as a detective provided career advancement opportunities and additional training and experience that would be valuable in a post-law enforcement career.

27.     On February 13, 2020, then Undersheriff Heit sent an email to Sheriff's Department employees regarding a newly created Deputy Investigator position that would be assigned to the Violent Crimes Task Force ("VCTF") and would coordinate investigations with the Sheriff's Department's detective unit. **(Exhibit 1).**

28.    Assignment to the deputy investigator position would bring significant benefits, including the use of a take-home car, as well as additional overtime opportunities.

29.    Dyer, then a sergeant, contacted Chief Deputy Boyce and inquired if he could apply for this position. Boyce told Dyer that he could not apply as the position was only open to deputies.

30.    Johnson, also then a sergeant, contacted Undersheriff Heit and inquired if he could apply for this position. Heit told Johnson he could apply for the position, but if he was selected, he would have to accept a demotion to a deputy. **(Exhibit 2).** Dyer received a similar message. **(Id.)**

31.    Both Johnson and Dyer saw the newly created position of deputy investigator as a way into the highly sought after detective unit position.

32.    On or about March 10, 2020, Boyce told Dyer that the candidates for the Violent Crimes Task Force position were also candidates for the next sergeant promotion. If the person who was chosen to be promoted to sergeant was also chosen for the Task Force position, they would have to chooses between the two options.

33.    Dyer and Johnson did not put their names in as candidates for the Task Force position since it would require a demotion.

34.    In May of 2020, Det. Sgt. Cathy Easton and Det. Lt. Rick Biggart retired from the detective unit, leaving two detective spots open.

35.    On May 21, 2020, an email was sent out to employees soliciting letters of interest for the detective sergeant position.

36.    On June 14, 2020, Dyer requested that Chief Boyce write a letter of recommendation on his behalf for the detective sergeant position. Boyce agreed.

5

37.    On June 16, 2020, Boyce informed Dyer that he can no longer provide a letter of recommendation because Boyce is "hopefully going to be involved" in the selection of the detective sergeant. **(Exhibit 3).**

38.    Interviews were completed through the end of June. On June 17, Sgt. Dodd was put in the position of Detective Sergeant. On June 25, 2020, Joe Kovac was promoted to sergeant and assigned the Task Force position.

39.    On June 26, 2020, Dyer asked Boyce where he was on the testing list for detective sergeant.[1] Boyce informed him that he was number two. **(Exhibit 4).**

40.    Also on June 26, 2020, Sheriff Paul Bailey informed the Sheriff's Department that deputy Andrea Crosby would fill the deputy investigator role**. (Exhibit 5).**

41.    Crosby did not interview for the deputy investigator role.

42.    Upon hearing that Crosby was selected for the deputy investigator role without an interview, Dyer contacted Capt. Miller and expressed his concerns. According to Dyer, Crosby was frequently late for her assigned shifts and did not contribute to the department in any significant manner.

43.    On July 1, 2020, Dyer filed grievances related to the candidate choices for the Task Force and deputy investigator positions. Both grievances were denied immediately.

44.    On July 3, 2020, Dyer requested a meeting with Sheriff Bailey.

45.    On July 8, 2020, Dyer met with Undersheriff Heit in Heit's office. Dyer explained that he had been denied the opportunity to interview for the position given to

---

[1] Police departments often promote off a list that ranks candidates following testing to ensure that persons are not chosen for a position for discriminatory reasons.

Sgt. Kovac and there was no process in place for the deputy investigator position assigned to Crosby.

46.     Previously, all positions in the detective unit were the rank of sergeant or lieutenant.

47.     Upon information and belief, the deputy investigator position was only created to put a female in that unit.

48.     Heit explained that both Crosby and Kovac were finalists for the Task Force position. The department decided that since Kovac was next to be promoted sergeant, he would get the Task Force position. And since the only female in the detective unit had retired, Crosby would be assigned to the detective unit as the newly created deputy investigator.

49.     Allowing a sergeant to join the Task Force role was contrary to what the command staff had told the potential candidates.

50.     Heit stated that he believed putting a female in that position was a bona fide occupational qualification, but did not explain any qualification other than her sex.

51.     Heit then denied Dyer's Step II grievance. **(Exhibit 6).**

52.     Because Dyer's level of emotion around being denied the opportunity for career advancement was inflamed, members of the Sheriff's Department's command staff reached out to Dyer to see how he was holding up.

53.     Capt. Miller told Dyer that some were worried Dyer would hurt himself.

54.     Dyer found that allegation to be preposterous, but wondered if after making complaints about improper promotions he was being pushed towards a mental evaluation and a fitness for duty test merely for raising concerns.

55.    On July 8, Johnson met with Sheriff Bailey to discuss why Crosby was assigned the coveted detective unit position. Bailey told Johnson it was because he wanted a female in this role.

56.    Bailey told Johnson that it was not that Crosby was a better candidate, just that he wanted a female in the unit.

57.    On July 9, 2020, Dyer met with Sheriff Bailey about the issues he had raised regarding the promotions and assignments.

58.    Dyer explained that he had previously given up a higher paid position as a K-9 handler to become a sergeant because there was a past practice of placing the next senior sergeant into the detective unit.

59.    Dyer explained that he wanted to better himself as a police officer by working in the detective unit and that the schedule for this position was better suited to his family.

60.    Sheriff Bailey explained that the FBI wanted Kovac in the Task Force position, so he changed that position to a sergeant's role when Kovac was on the promotion list. Since Crosby was number two on the promotion list, she was put into the detective unit role, as a deputy, without an interview. The Sheriff named another female deputy and said if she had been on the list, he would have put her in that spot instead.

61.    Sheriff Bailey told Dyer that there was no way Dyer could have filled the role in the detective unit because there has to be a female in the detective unit.

62.    Dyer asked Sheriff Bailey if Crosby had any better qualifications than Dyer.

63.    Sheriff Bailey responded, "Heck no, she's a female. Did Cathy Easton have any better qualifications, no. I just wanted a female in that position." **(Exhibit 7 – recording).**

64.    Dyer recorded the conversation with Bailey. **(Exhibit 8- recording transcript).**

65.    On July, 29, 2020, Dyer again met with Sheriff Bailey about his grievances regarding the assignments. Also present was Deputy Streelman, a union representative.

66.    Dyer asked if himself or Sgt. Johnson had been second on the list of Task Force candidates, would they have been given the deputy investigator position Crosby was? Sheriff Bailey said no, because he wanted a female in that role.

67.    Dyer asked if no females applied for the position, if the Sheriff would allow a male to work there.

68.    The Sheriff responded that no, he would not allow that. He would assign a female road patrol deputy to the detective unit if no one wanted the position. They did not have a choice where they were assigned.

69.    Deputy Streelman asked the Sheriff if anyone has ever held the title of Deputy Investigator before Crosby. Bailey was not sure.

70.    Streelman clarified that Crosby was not filling in a position that someone had held in the past. Bailey also confirmed Crosby was not filling an existing position.

71.    The Sheriff also stated that if Crosby was promoted to sergeant, he would classify the job as sergeant's position. Dyer asked if that meant a new sergeant's position would be added (which would not be permissible within the terms of the collective bargaining agreement). Bailey realized he could not go that route and said Crosby would have to go back to working the road if she was promoted and a new female deputy investigator would be assigned.

72.    Dyer asked Bailey, "Is there anything a female can do that a guy can't do up there in the detective unit? Bailey responded, "No. I just want a female up there." **(Exhibit 9, recording). (Exhibit 10, recording transcript).**

73.    On August 3, 2020, Dyer contacted the Equal Employment Opportunity Commission ("EEOC")  regarding the discrimination he faced on the basis of his sex. **(Exhibit 11).**

74.    The EEOC is commonly delayed in scheduling interviews for discrimination complaints for months. This was particularly true during the COVID-19 era.

75.    Dyer let it be known within the Sheriff's Department that he had contacted the EEOC regarding the discrimination he faced.

76.    On August 11, 2020, Sheriff's Department denied Dyer's Step III Grievance. **(Exhibit 12).**

77.    In November, Dyer was able to schedule an interview for December 9, 2020. **(Exhibit 13).** On December 9, Dyer was informed that his interview was changed to March 9, 2021. (Id.)

78.    On March 10, 2021, Dyer filed a charge of discrimination with the EEOC, alleging that he was discriminated against on the basis of his sex. **(Exhibit 14).**

79.    On April 20, 2021, Johnson filed a charge of discrimination with the EEOC, alleging that he was discriminated against on the basis of his sex. **(Exhibit 15).**

80.    Johnson let it be known within the Sheriff's Department that he had contacted the EEOC regarding the discrimination he faced.

81.    Dyer applied for a position as the drive track instructor in June of 2021.

82.    In June of 2021, Sheriff Bailey selected Deputy Utt for the drive track position. Deputy Utt had only been with the Sheriff's Department for two years.

83.     Dyer and Johnson both applied for the promotion list for lieutenant in May of 2021.

84.     Candidates for promotion are required to participate in a promotional potential meeting. This meeting consists of all current road patrol Lieutenants, Captains, and Chief Deputy individually ranking each applicant for the Lieutenants position based off input from all those individuals at the meeting

85.     In July of 2021, Lt. Sanders called Dyer a disgruntled employee during his promotional potential meeting.

86.     In a meeting with chief deputy Boyce, Dyer complained that he was being retaliated against and had been labeled disgruntled. Dyer stated that he would be filing a charge of retaliation with the EEOC for how he had been treated since his EEOC charge of discrimination.

87.     Boyce stated that he didn't blame Dyer for filing a charge of discrimination. Boyce also stated that the sheriff was the ultimate decision maker for all personnel decisions.

88.     Following the promotional potential ranking, Dyer was ranked three out of four. Johnson is ranked fourth.

89.     On or about September 1, 2021, Sgt. Soulard was notified he was in the top position following the lieutenant's exam. This meant when the next lieutenant position opened, Soulard would be the first to be offered that position.

90.     Dyer was in the second position on the promotion list. Johnson was in the third position.

91.     The results of the test were valid for one year. Following the expiration of the test results, lieutenant candidates would have to retest and risk moving down the list.

11

92.     On October 4, 2021, Undersheriff Heit again posted a position for a deputy to be assigned to the FBI Violent Crimes Task Force. **(Exhibit 16).**

93.     Johnson again applied for the position. (Id.).

94.     Heit told Johnson the position for a deputy, not a Sergeant. (Id.).

95.     But the VCTF position had been occupied by a Sergeant for the last year.

96.     In January of 2022, the lieutenant position in the marine division opened. Johnson applied.

97.     Dyer applied for the marine lieutenant position as well.

98.     Neither Dyer nor Johnson were selected for the position. A recently promoted Sergeant was put into the position.

99.     Sheriff Bailey has stated that Dyer was not selected for the position because he had no marine experience.

100.    But Dyer had previously worked for the New Buffalo Police Department as a marine officer and was trained by the U.S. Coast Guard. Dyer was the only applicant who had worked as a certified police officer in a marine position.

101.    The chief deputy informed Dyer that Sgt. Hopkins was not the number one candidate following the interviews, but Hopkins is who the Sheriff wanted in the role.

102.    In January of 2022, Dyer requested to attend a police supervisor liability training as well as a course on basic Spanish for law enforcement. There were no Spanish speakers in the Sheriff's Department. The two training sessions were in the same week in Cincinnati, OH.

103.    Dyer was rejected for the training sessions. The reasoning provided was that the training sessions were too far away.

104.    But deputies had been sent to training in Traverse City, which is only 14 miles further than Cincinnati, and other deputies had attended training sessions in Pittsburgh, PA,  and Orlando, FL, both significantly farther than Cincinnati.

105.    On or about February 13, 2022, Dyer was contacted by the Sheriff about being promoted. The Sheriff informed Dyer that because Dyer was next on the list, the Sheriff is obligated to promote Dyer for the next opening.

106.    In March of 2022, Dyer again put in for a position as a driving instructor. **(Exhibit 17).**

107.    This time Dyer was passed over for the driving instructor position for a less experienced deputy.

108.    Sheriff Bailey stated that Dyer was not chosen for the driving instructor position due to a crash he was involved in twelve years before, in 2010.

109.    But the deputy who was selected for the position had been in more crashes, and more recent crashes than Dyer. The deputy also been more frequently disciplined and had been suspended.

110.    Dyer and the deputy who was chosen were the only candidates for the driving instructor position in March of 2022.

111.    On or about May 6, 2022, Johnson applied for an open lieutenant position in the Berrien County jail.

112.    The undersheriff, Heit, informed Johnson that he was not eligible for the position because he had not been a Jail Sergeant for two years.

113.    In May of 2022, Dyer submitted his letter of interest for joining the bomb team. His application was denied. Chief Deputy Boyce told Dyer that the reason for the denial was that the Sheriff did not allow deputies to serve on two specialty teams.

114.    Dyer provided the Chief Deputy with the names of other individuals who were on more than two specialty teams. The Chief Deputy agreed that Dyer was correct, and then said that command did not want to short the road patrol a person for five weeks when Dyer would be in training for the bomb unit.

115.    The person who was eventually chosen for the bomb team came from road patrol and shorted the road patrol staff for five weeks.

116.    Dyer was promoted to Lieutenant and began his duties as the Niles Township lieutenant on June 10, 2022.

117.    Whereas every other lieutenant has been provided with a week of training following promotion, Dyer was not.

118.    On or about July 27, 2022, Dyer was informed by a new hire at the department that he was informed not to listen to Dyer because Dyer is a "disgruntled employee."

119.    In August of 2022, a lieutenant position in the training unit opened. Johnson was the only pending lieutenant not notified of the opening.

120.    Dyer sent a letter of interest to the Sheriff regarding the opening in the training unit for a lieutenant. **(Exhibit 18).**

121.    The training unit lieutenant position is a coveted position in the Sheriff's Department.

122.    Sheriff Bailey informed Johnson that the existing lieutenant, Lt. Kurtz, would not be leaving the position until mid-September, which would be after the expiration of the current promotion list.

123.    The training unit position was always staffed by a lieutenant who was certified by the Michigan Commission on Law Enforcement Standards ("MCOLES"), the state body responsible for certifying police officers.

124.    Deputies who are assigned to jail duties are not required to be MCOLES certified.

125.    Sheriff Bailey placed Lt. Erin Kuhl in the training unit position on August 21, 2022. **(Exhibit 19).**

126.    Lt. Kuhl is not MCOLES certified.

127.    Dyer was the lead defensive tactics instructor for the Sheriff's Department, an accident reconstructionist, and a member of the tactical response team.

128.    As the lead defensive tactics instructor, Dyer was often tasked with coordinating all department personnel to participate in training sessions.

129.    This is also one of the duties of the training unit lieutenant.

130.    Lt. Kuhl was not certified to train officers, was not a police officer, and had no experience as a police officer. All of her experience at the Sheriff's Department was in the operation of the jail, which is not a police position.

131.    On August 26th, Lt. Kurtz retired – three weeks earlier than Bailey had informed Johnson.

132.    The promotion list expired on September 1, 2022, without Johnson being promoted.

133.    On September 7, 2022, Dyer filed a charge of Retaliation with the EEOC. **(Exhibit 20).**

134.    On or about September 23, 2022, Dyer met with Sheriff Bailey on his Step III grievance regarding the training unit position. Also in the meeting was Operations Lt. Dave Zizkovsky.

135.    Dyer and Zizkovsky met at a separate location after the grievance meeting.

136.    At the later meeting, Zizkovsky told Dyer of several complaints that the detective unit made about Dyer's job performance. Dyer told Zizkovsky that all of the alleged complaints were false.

137.    Zizkovsky told Dyer that he believed the administration was "out to get" Dyer and now realizes that the things Dyer has been bringing up are true. Zizkovsky told Dyer he feels the administration is trying to "come after" Dyer.

138.    Following the expiration of the promotion list, new candidates were again sought, with letters of interest due on September 13, 2022.

139.    Johnson sent in a letter of interest for this promotion list.

140.    Following testing, Johnson was the second highest candidate on the promotion list.

141.    On January 1, 2023, Deputy Grenon, the K-9 handler who took over for Dyer, was promoted to Sergeant and his dog, Maxx, which was previously Dyer's dog, was retired.

142.    When Dep. Grenon asked that the retiring dog go home to Dyer, [2] the Sheriff decided the dog wasn't ready for retirement yet and kept the dog working for four more months. Maxx was eventually retired to go home with Dyer.

143.    In May of 2023, Johnson was promoted to Lieutenant.

---

[2] Retired police dogs generally live out their 'retirement' with their longest running handler.

144.    On or about May 17, 2023, Lt. Kuhl was speaking with Dyer about upcoming Union contract negotiations. Lt. Kuhl proposed a plan for Dyer to send some requests for contract negotiations to throw the sheriff off on what we would be negotiating for.

145.    It was apparently well known that Sheriff Bailey could read any deputy's email.

146.    Kuhl informed Dyer that Bailey read everything Dyer sent or received. Kuhl said, "He knows what what's going on, because we all know if it's got your name on it. He's gonna (sic) read it." **(Exhibit 21 – transcript of recording)**

147.    Dyer asked Lt. Kuhl, "Would you say that the sheriff is watching every move I make?" Kuhl's response was, "I would say that, yes." (Id.)

148.    Dyer asked why the Sheriff would do that. Kuhl responded, "I don't know. He just has a hard on for you. You done pissed him off somehow." (Id.)

149.    Also on May 17, 2023, Chief Deputy Boyce spoke with Dyer regarding Dyer's application for the training unit lieutenant's position. Boyce said that Dyer was more qualified for the position, but the Sheriff wanted Lt. Kuhl. Lt. Kuhl is a female.

150.    In June of 2023, Johnson requested an accommodation to wear a lighter weight gun belt to alleviate health concerns he was experiencing. Johnson's doctor sent the Sheriff's Department a letter requesting the lighter weight gun belt. **(Exhibit 22).**

151.    Nylon gun belts are considerably lighter than leather gun belts.

152.    There are several Sheriff's Department employees who are authorized to wear nylon gun belts.

153.    Johnson's request for a nylon gun belt was denied. **(Id.)**

154.    Sheriff Bailey retired at the end of 2023.

155.    Charles Heit was appointed interim Sheriff and then elected to the office in November of 2024.

156.    The polices of Bailey continue in practice under Sheriff Heit.

157.    The EEOC issued a Determination that there was reasonable cause to believe Dyer was subjected to discrimination based on his sex and retaliated against for his complaints. **(Exhibit 23).**

158.    The EEOC issued Right-to-Sue letters for Dyer on August 26 and 27, 2025. **(Exhibit 24).**

159.    On or about January 24, 2025, the EEOC issued a Determination that there was reasonable cause to believe that Johnson was discriminated against on the basis of his sex in the terms and conditions of his employment. **(Exhibit 25).**

160.    The EEOC issued a Right-to-Sue letter for Johnson on August 26, 2025. **(Exhibit 26).**

161.    Dyer and Johnson have been harmed by the actions and inactions of defendants.

## COUNT I
## DISCRIMINATION BASED ON GENDER

162.    Plaintiffs incorporate by reference paragraphs 1 through 161 as fully set forth herein.

163.    At all material times, Berrien County was an employer, covered by and within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

164.    At all material times, Bailey and Heit were "agents" of Berrien County, within the meaning of Title VII of the Civil Rights Act of 1964 (Title VII), as amended.

165.    Dyer and Johnson's sex was a factor that led to their denial of promotions, assignments, and discriminatory treatment described above.

166.    Berrien County, by its agents, representatives, and employees, was predisposed to discriminate on the basis of sex and acted in accordance with that predisposition. Defendants Bailey and Heit were the decision makers in the discriminatory actions.

167.    Defendants' actions were intentional, with reckless indifference to Dyer and Johnson's rights and sensibilities.

168.    If Dyer and Johson had been female, they would not have been treated in the manner described.

169.    As a direct and proximate result of defendants' wrongful acts and omissions, Dyer and Johson have sustained loss of earnings, earning capacity, fringe benefits, and have suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation and opportunities.

## COUNT II
## RETALIATION FOR COMPLAINTS OF DISCRIMINATION

170.    Plaintiff incorporates by reference paragraphs 1 through 169 as fully set forth herein.

171.    It is unlawful for an employer to retaliate against, harass, or otherwise punish any employee for: opposing employment discrimination that the employee reasonably believed was unlawful; for filing an EEOC charge or complaint; or participating in any investigation, hearing, or other proceeding connected to Title VII enforcement. 42 U.S.C. § 2000e-3(a).

172.    Bailey and Heit, as Berrien County's agents, retaliated against Dyer and Johnson for having opposed employment discrimination, for making the complaint about unlawful sex discrimination, and for participating in an investigation connected to Title VII enforcement.

173.    Defendants' actions were intentional, with reckless indifference to Dyer and Johnson's rights and sensibilities.

174.    Berrien County command staff have reported that they were told by the current undersheriff, an agent of Berrien County, to find a reason to get rid of  Dyer and Johnson.

175.    As a direct and proximate result of defendants' wrongful acts, Dyer and Johnson have sustained loss of earnings, earning capacity, fringe benefits, and has suffered mental anguish, physical and emotional distress, humiliation and embarrassment, and loss of professional reputation and opportunities.

**COUNT III**
**VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**(Sex Discrimination)**

176.    Plaintiffs incorporate by reference paragraphs 1 through 175 as though the same were fully set forth herein.

177.    Plaintiffs, as male employees, are within the class of protected individuals under the Elliott-Larsen Civil Rights Act, MCL 37.2101, *et seq*.

178.    At all material times, plaintiffs were employees, and defendants were their employer, covered by and within the meaning of the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*

179.    During the course of their employment with Berrien County, Dyer and Johnson were discriminated against on the basis of their sex.

180.    Male employees were not given the same promotional opportunities as female employees.

181.    Job assignments were made on the basis of sex.

182.    Bailey did not respect female employees, but provided them preferential assignments on a discriminatory belief that females should be in certain roles.

183.    The discrimination had the purpose or effect of substantially interfering with Dyer and Johnson's employment.

184.    Berrien County had duties under the ELCRA, including the duty not to discriminate against or harass Dyer and Johnson on the basis of sex.

185.    Defendant violated those duties in the ways described above and discriminated against Dyer and Johnson based on their sex, causing them loss and damage.

186.    The discrimination by defendant violates the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.

187.    As a result of the hostile and discriminatory environment created by Bailey and Heit, Dyer and Johnson were treated differently than their female counterparts and denied opportunities for advancement.

188.    Dyer and Johnson's opposition to Bailey and Heit's violations of ELCRA, and their report of the incidents of discrimination to management, human resources, the union, and the EEOC was a significant factor in Berrien County's decision to deny advancement and demean plaintiffs in their roles at the Sheriff's Department.

189.    Dyer and Johnson have suffered and continues to suffer damages, including but not limited to:

    a.    Lost wages, including back and front pay;

    b.      Lost career opportunities with defendant;

    c.      Lost fringe benefits;

    d.      Humiliation, embarrassment, fright, shock, and other mental anguish and distress;

    e.      The costs of litigation, including reasonable attorney's fees and witness fees in accordance with MCL 37.2802.

**COUNT IV**
**VIOLATION OF ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**(Retaliation)**

190. Plaintiffs incorporate by reference paragraphs 1 through 189 as though the same were fully set forth herein.

191. Plaintiffs, as male employees, are within the class of protected individuals under the Elliott-Larsen Civil Rights Act, MCL 37.2101, *et seq*.

192. At all material times, Dyer and Johnson were employees, and defendant Berrien County was their employer, covered by and within the meaning of an "employer" under the Michigan Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.*

193. During the course of their employment with defendant, Berrien County's agents, Bailey and Heit, subjected Dyer and Johnson to a hostile work environment based on their complaints of sex discrimination.

194. When Dyer and Johnson complained to the command structure of Berrien County of the hostile work environment, no meaningful changes were made to remedy the hostile environment.

195. Multiple command officers confirmed Dyer and Johnson's beliefs that Bailey, Heit, and their supporters were retaliating against plaintiffs.

196.    Berrien County command staff have reported that they were told by the current undersheriff, an agent of Berrien County, to find a reason to get rid of Dyer and Johnson.

197.    The ELCRA prohibits an employer from discriminating against an employee or retaliating against an employee because the employee participates in a discrimination investigation or opposes discrimination in the workplace. MCL 37.2701(a).

198.    Dyer and Johnson participated in an EEOC discrimination investigation and opposed defendant's failure to address sex discrimination.

199.    Berrien County retaliated against Dyer and Johnson following their protected activities of reporting gender discrimination, opposing gender discrimination and participating in an discrimination investigation by:

> (1)    Eliminating them from preferred assignments;
>
> (2)    Denying them promotional opportunities and
>
> (3)    Slandering their name and reputation in the law enforcement community

200.    Following Dyer and Johnson's reports of sex discrimination, the assignments they applied for were consistently assigned to less qualified individuals with less experience.

201.    Dyer and Johnson have suffered and continue to suffer damages, including but not limited to:

> a.    Lost wages, including back and front pay;
>
> b.    Lost career opportunities with defendant;
>
> c.    Lost educational opportunities;
>
> d.    Lost fringe benefits;

e.    Humiliation, embarrassment, fright, shock, and other mental anguish and distress;

f.    The costs of litigation, including reasonable attorney's fees and witness fees in accordance with MCL 37.2802.

WHEREFORE,  plaintiffs, Dyer and Johnson, respectfully requests this Court to enter a judgment in their favor and against defendants as follows:

A.    Legal Relief

(1)    Economic damages based on their lost wages and fringe benefits, both past and future;

(2)    Compensatory damages for injuries such as emotional distress, pain and suffering, harm to reputation, and other consequential injuries;

(3)    Attorney fees and costs;

B.    Equitable Relief

(1)    An injunction prohibiting any further acts of retaliation or discrimination;

(2)    An award of interest, costs, and reasonable attorney fees; and

(3)    Such other relief as may be deemed appropriate at the time of final judgment.

CUNNINGHAM DALMAN, P.C.
Attorneys for Plaintiffs

Date: September _, 2025          By:  ___ */s/ Robert M. Howard*
                                       Robert M. Howard (P80740)
                                       Bradley K. Glazier (P35523)

                                 BUSINESS ADDRESS:
                                       321 Settlers Road
                                       Holland, MI 49423
                                       (616) 392-1821

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**
_____

THOMAS DYER,                                        Case No.:
an Individual, and

ROGER JOHNSON
an Individual

                 Plaintiffs,                        HON.

v.
BERRIEN COUNTY,

CHARLES HEIT
In his individual and official capacities, and

L. PAUL BAILEY
In his individual and official capacities

                 Defendants.
_____

Bradley K. Glazier (P35523)
Robert M. Howard (P80740)
CUNNINGHAM DALMAN, P.C.
Attorneys for Plaintiff
321 Settlers Rd.
Holland, MI 49422
(616) 392-1821
_____

## JURY DEMAND

    Plaintiffs', Thomas Dyer and Roger Johson, request a trial by jury.

CUNNINGHAM DALMAN, P.C.
Attorneys for Plaintiffs

Date: September _, 2025          By:  ___*/s/ Robert M. Howard*___
                                      Robert M. Howard (P80740)
                                      Bradley K. Glazier (P35523)

BUSINESS ADDRESS:
    321 Settlers Road
    Holland, MI 49423
    (616) 392-1821